THE TRENTON MUTUAL LIFE AND FIRE INSURANCE COM-
PANY *vs.* JOHN McKELWAY and others.

By the charter of an insurance company, all persons insured became members
of the company, and all claims and losses sustained, to a greater amount than
the company had funds on hand to discharge, were to be raised by assess-
ments, to be made ratably on the members, according to the amount of each
member's insurance, provided that such assessment should not exceed the
amount of the note or obligation given by each member, and one per cent.
on the principal sum mentioned in each policy. After the business had been
carried on for some time, the directors resolved that the company should
raise a guaranty capital of $150,000, which should be put up in money
bonds payable on demand, and secured by a mortgage or stocks, as collateral
security, which should be liable to assessment *pro rata*, to make good any
losses which the company might sustain after all other available means had
been exhausted. The contributor to such capital was to receive six per cent.
per annum on the amount of his bond out of the earnings of the company.
The corporation having become insolvent, an assessment was made, by the
order of this court, on the guaranty capital, and a bill filed to recover on
the defendant's mortgage the amount assessed against him.

*Held,* that the corporation had no power to enter into the contract with the
contributors to the guaranty fund, and that such contract was illegal and
void, and could not be enforced either in a court of law or equity.

Where the charter of an insurance company makes its members mutual in-
surers, and constitutes a fund to meet losses made up from premiums to be
contributed by the members, and one per centum on the amount for which
each is insured, no other fund can be created for that purpose.

And although such company may, under proper circumstances, borrow money,
it cannot, under pretence of borrowing money, provide a fund for the pur-
pose of giving credit to the company.

The creditors of such corporation have no right to look to any other fund than
that which the charter provides, and they cannot ask the court to enforce
an illegal contract for their benefit.

It would seem that the mortgage may be held as security for the interest paid
by the company upon it, and the bill was dismissed without prejudice to
this question.

_B. Gummere_, _M. Beasley_, and _W. L. Dayton_, for com-
plainants.

_C. S. Green_ and _J. P. Bradley_, for defendants.

THE CHANCELLOR. This company was incorporated by an act of February 5th, 1847. By its charter, all persons insured became members of the company, and from among these members, seven persons were to be annually chosen as directors, a majority of whom should be residents of the city of Trenton. The company was authorized to insure lives, and also real and personal property, against loss or damage by fire. Of all claims and losses sustained, to a greater amount than the company had funds on hand to discharge, the deficiency was to be assessed in a ratable proportion on the members, or their lawful representatives, according to the amount of each member's insurance; *provided*, that such assessment should not exceed the amount of the note or obligation given by each member, and one per cent. on the principal sum mentioned in each policy, which was to be paid within sixty days after notification.

The company immediately commenced business. Up to April, 1849, the business of fire and life insurance had been prosecuted to a very considerable extent, and was then rapidly increasing. The board of directors conceived that it would be advantageous to provide a guaranty capital, to be raised and contributed as an additional security for the payment of losses which the company might sustain in the course of its business. On the 28th day of April aforesaid, at a meeting of the directors, it was resolved that the company should raise an actual capital of $150,000, which should be put up in money bonds payable on demand, and secured by mortgage or stocks, as collateral security, which should be liable to assessment *pro rata*, to make good any losses which the company might sustain in the course of its business, after all other available means of the company had become exhausted. As a compensation for the risk incurred, the contributors to said capital were to be paid, each, six per cent. per annum upon the amount of his contribution out of the earnings of the company.

The defendant, John McKelway, became a contributor to this fund to the amount of $2000, and gave his bond for that sum, secured by a mortgage. The company has been declared insolvent by a decree of this court, and its concerns are being closed under the court's directions. The available means of the company have been exhausted, and there remains nothing except the guaranty capital to meet the liabilities of the company. Under an order of the court, the directors have made an assessment according to the terms of the agreement upon which the contributions were made. It is to enforce the assessment, thus made upon the bond and mortgage given by John McKelway, that this suit has been instituted. The defendants, by their answer, set up the facts and circumstances under which the mortgage was given, and insist that the action and all the proceedings of the directors in raising the guaranty capital were illegal, in violation of the charter of the company, against public policy, and that, therefore, the company cannot enforce the contract made with any of the contributors to the fund.

I have had every disposition to enforce the payment of this mortgage, if it could be done legally. I was in hopes that the contributors to this guaranty capital would not have been able successfully to resist the demands made upon them. If I entertained any doubts in my mind how this cause should be decided, I should, without the least hesitation, resolve those doubts against the defence which is made in this suit. But I have none; and I cannot see how the contract with the contributors to this guaranty fund can be enforced in a court of law or equity without repudiating altogether the principle of the common law, which has been but re-enunciated by our statute, (*Nixon* 138, § 3,) that no corporation shall possess or exercise any corporate powers, except such as shall be expressly given in its charter, or which shall be necessary to the exercise of the powers so enumerated and given.

Was it within the scope of the powers of this corporation to provide any other capital or fund as the basis of the business which it was empowered to pursue than one provided by the charter itself? If it was illegal for them to create such a capital, then a contract which they may have made for its payment cannot be enforced. This corporation was incorporated for the purpose of insuring lives and loss by fire. The charter provides the fund out of which losses are to be paid, and it is this feature in the charter which stamps the character of this corporation, and which makes it what its name imports, and what the legislature intended it should be, a *mutual* company. The corporators are mutual insurers; and it is the fund which is made up from the premiums which they contribute, and one per cent. on the amount for which each one is insured, out of which they are to be indemnified for any losses. They have no right or authority, by their charter, to create any other fund for the purpose. If they do, it is in violation of the principle which is to govern their mode of doing the business for which they were incorporated. It was admitted, on the argument, that it was not within the scope of the powers of this corporation to create any capital other than that which the charter provides. It was attempted to escape the consequences of such an act by the argument, that this was nothing more than a contract for a loan of money, out of which the corporation might be enabled to meet the losses that might be incurred. It cannot be denied but that the corporation might borrow money under some circumstances, and that a contract *bona fide* made for such loan would be illegal, and not in contravention of the charter. For instance, should the corporation incur a loss, and not have the available means promptly to meet it, it would not be illegal for them to make a loan to meet the exigency. But they cannot, under pretence of borrowing money, provide a fund for the purpose of giving credit to the company. The question is as to the *bona fides* of the

transaction. It matters not what you call it. The name does not affect its real character. Was this a *bona fide* loan of money, or a contract for a loan, made in the ordinary course of business, and to meet an exigency which would bring such a contract within the compass of the legitimate powers of the company? or was it a contract to provide a capital, or fund, for the purpose of giving a credit and character to the company which is entirely foreign to its charter? Can this be called a legitimate contract for a loan in the ordinary course of business? The defendant, McKelway, gave to the directors his bond and mortgage for two thousand dollars, payable on demand with interest, and they, in exchange, gave him a certificate that they would pay him six per cent. interest upon two thousand dollars, upon condition that, if they meet with losses, after they had exhausted all their other means to pay, the deficiency should be made up out of the mortgage, and then the mortgagor should become a debtor to the company for that amount. Can a court close its eyes to the real character of the transaction, and to the object and purposes of the parties, and call it a contract for a loan? It was a contract in violation of the spirit of the charter—a contract which the corporation had no right to make. The directors paid out of the funds of the company upwards of $17,000 upon this pretended loan, from which they have never derived one dollar's benefit. But that the parties never contemplated this as a contract for the loan of money, is not left to mere conjecture. They did not make the contract under a mistake, intending to make a mere loan, and supposing that they were legitimately exercising a power to do so. That was not their purpose. They had a different object in view. It is expressed in their bill of complaint, and recorded several times upon their minutes. The bill of complaint alleges that the directors concluded to enter into this negotiation because, in their opinion, it would prove advantageous to the corporators to provide a guar-

M*

anty capital as an additional security for the payment of losses. Here, then, is the admission of the company upon the record, that this contract was made for an illegal purpose. The minutes of the corporation show more. They show that this was a device for the purpose of complying with the laws of the state of New York, which provides that no insurance company shall transact business in that state unless such company is possessed of an actual capital of $150,000. The simple question then is presented—could this corporation lawfully adopt any scheme or device by which they could create a capital of $150,000, for the purpose of acquiring a credit upon which to transact business? In my judgment they could not, and any contract entered into for such a purpose is unlawful, and cannot be enforced.

But it was said, on the argument, that these complainants are mere trustees acting now under the authority of the court, and that these proceedings are for the benefit of third persons, who are innocent parties; that these innocent parties have been induced to insure in the company by reason of the fictitious credit which the company acquired by means of this capital, and that the defendant, as one of the wrongdoers, is estopped from setting up his own fraud against enforcing this mortgage. for the benefit of a party who has been injured by his wrongful act. But the principle of equity which is invoked has no application to the case. The persons who are losers, and whose losses it is sought to impair by these proceedings, are the corporators. They insured under the provisions of this charter. If they became corporators knowing of this illegal capital, they countenanced this fraud upon the law. They had no right to look to anything for remuneration but to the fund which the charter provides, and have no right to complain if the court will not help them to any other fund. The charter—the law—does not give them this fund, and they have no right to ask the court to enforce an illegal contract for their bene-

fit.   This whole transaction is against public policy, and
the court ought not to give countenance to it in any way.
Of what avail is it to declare it illegal, and contrary to
public policy, if the court enforces it?

Again, it does not appear that they are innocent par-
ties.   There is no such issue made by the pleadings, as
that they have been drawn in to become corporators by
this fraud of the directors and the contributors to this
fund.   For anything that appears to the contrary before
the court, the corporators who have met with losses were
corporators prior to this arrangement in reference to the
guaranty capital.   It does not appear that they insured
upon the faith of this capital, or that they were induced
to become corporators in consequence of its existence.   If
they insured upon the guaranty which the charter gives
(and they had no right to rely upon anything else), then
they are not injured by this transaction, except so far as
the funds of the company have been illegally taken to
pay interest on this capital.

My first impression of this case was, that it was possible,
under these proceedings, to declare this mortgage a lien
for the interest which the company had paid upon it.   But
I am satisfied no decree to that effect can be made in this
suit.   It was not instituted with any such view, and pre-
sents the case in an entirely different aspect, which the
defendant is entitled to meet by his answer, whenever it
is presented. It is true he admits he received the interest,
but under what circumstances it was not necessary for
him to disclose any further than to meet the case as it
was presented.   But I shall dispose of the case by a de-
cree that will not permit the defendants to escape such a
liability, if it exists.   I shall order the bill dismissed
without prejudice to any claim the complainants may have
for this interest.

Let a decree be drawn accordingly.